IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VICTOR ASUNCION SANTOS-EK,

           Petitioner,

    v.

MARK NOOTH,

           Respondent.

Case No. 2:18-cv-01565-HZ

OPINION AND ORDER

Tonia L. Moro
Assistant Federal Public Defender
19 S. Orange Street
Medford, OR 97501

      Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Kristen E. Boyd, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

      Attorneys for Respondent

1 – OPINION AND ORDER

HERNANDEZ, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his Washington County convictions dated February 21, 2012. For the reasons that follow, the Amended Petition for Writ of Habeas Corpus (#40) is denied.

<u>**BACKGROUND**</u>

J, Petitioner's 12-year-old daughter, generally went to school at about 7:20 a.m. and returned home at about 2:30 p.m., sometimes a little later. Respondent's Exhibit 105, p. 143. On Wednesdays, she would arrive home by 1:45. Respondent's Exhibit 107, p. 112.  On Wednesday, May 18, 2011, J did not return home from school at the usual time. J was spending time with her friends at a park, and ultimately confided in them she did not wish to return home because Petitioner had been sexually abusing her.

Petitioner began looking for J at about 2:15 and, when he was unable to find her, he called the police at about 3:30 to report her missing. Officer Johnson responded to the report and visited the family's home where he was able to telephone one of J's friends who disclosed J's location at the park.

After Officer Johnson located J at the park, J told him that she was afraid to return home because Petitioner had been forcing her to have sex with him. J indicated that the most recent incident of abuse had occurred two days earlier on May 16, 2011. As a result of J's allegations, Johnson transported her directly to the hospital for an evaluation.

Petitioner ultimately discovered that the police had located his daughter but the authorities refused to provide him with her location. Petitioner contacted his pastor, and the two of them traveled to the Sheriff's Office in an attempt to ascertain what had happened to J.

Petitioner waited at the Sheriff's Office for an extended period of time before Detective Louka emerged. Louka, with the assistance of Officer Rios for translation, brought Petitioner back to an interview room where the pair read him his *Miranda* rights in both English and Spanish. Respondent's Exhibit 123, pp-3-4. Petitioner stated that he understood those rights and continued with the interview. *Id* at 3. Louka, having been briefed by Officer Johnson from the hospital, began to ask Petitioner whether he had sexually abused J. At first, Petitioner denied abusing J, but gradually began to admit having inappropriate contact with her. Louka "then explained to [Petitioner] that people at the hospital had found some evidence, and that [J] had stated some specific information about an incident that happened a couple of days ago." Respondent's Exhibit 123, p. 5. Louka's reference to evidence discovered at the hospital was a bluff; he was unsure whether any evidence had been found at all. Respondent's Exhibit 103, p. 94. He then informed Petitioner, "'I want to make sure that you were honest with me right now. I want to make sure you also understand that you are not going to be arrested today. That's not going to happen. . . .'" Respondent's Exhibit 103, p. 95.

At this point, Petitioner began to make more incriminating statements acknowledging that he had had sexual contact with J over an extended period of time. As a result, and contrary to Louka's earlier representation, authorities took Petitioner into custody that day. Ten days later, the Washington County Grand Jury indicted him on seven counts of Rape in the First Degree, six counts of Sexual Abuse in the First Degree, two counts of Sodomy in the First Degree, and two counts of Rape in the Second Degree. Respondent's Exhibit 102.

Petitioner moved to exclude the inculpatory statements he made during his interrogation because he only made them after Louka: (1) lied about the discovery of evidence at the hospital; (2) told Petitioner he needed to be honest; and (3) promised not to arrest him that day. Respondent's Exhibit 136. Petitioner argued that this combination rendered his statements involuntary such that they were not admissible. The trial judge denied his suppression motion, focusing on Louka's pledge not to arrest him and finding that the pledge was not one that Petitioner "subjectively relied upon in making an admission or a confession." Respondent's Exhibit 103, p. 138. The judge also reasoned that Plaintiff's immediate response to Louka's statements was, "I don't want to keep lying," thereby replying only to the request to be honest, not to the statement about the arrest. *Id* at 139. The judge concluded that after Louka pledged not to arrest Petitioner that day, and where there was no further discussion about an arrest or other detention,

Petitioner did not rely on the statement in making his confession. *Id* at 139-40.

The judge further found that not only did the authorities not make any threats or promises, but that Petitioner's confession was not otherwise coerced. "Of particular note to the court was that defendant voluntarily came to the police department" and "before any meaningful conversation was held about the facts of the case, defendant was advised of and subsequently waived his *Miranda* rights." *Id* at 141. The judge therefore ruled that Petitioner's confession was admissible.

At trial, J testified that in addition to the May 16 incident, there were many other instances of abuse but could only remember the details as to two other incidents. Respondent's Exhibit 105, pp. 428-48. For its part, the defense portrayed J as a rebellious youth who had an adversarial relationship with her parents. She had been the victim of sexual abuse by her uncle, Mazell, and harbored animosity against her parents for not preventing the abuse and for not reporting it to the authorities.[1] J lived in fear that Mazell might return, and she began to cut herself and had attempted suicide. When J's family ultimately disclosed the abuse involving Mazell to authorities, J was evaluated at CARES Northwest.[2] J's interview and evaluation occurred on February 11, 2022, a time during

---

[1] Mazell admitted to abusing J. Family members feared that if they contacted the authorities, they, themselves, might be subject to adverse immigration consequences. As a result, in lieu of contacting the authorities, family members successfully pressured Mazell to flee to Mexico. Respondent's Exhibit 105, pp. 148-49.
[2] CARES Northwest is a community-based medical clinic focused on treating and preventing child abuse.

which she would later claim Petitioner was sexually abusing her.
She did not, however, disclose any such parental abuse to the
CARES Northwest team during her February 11 interview.[3]
Respondent's Exhibit 105, p. 40.

The defense also introduced evidence that Petitioner would
often discipline J by grounding her, taking away her television
privileges, or taking away her phone. When these punishments
failed to deter J's behavior, he began to threaten to send her
to Mexico to live with her grandmother, or with placement in a
juvenile detention facility. Respondent's Exhibit 107, pp. 99-
100. One week prior to her accusation of sexual abuse against
Petitioner, J told her parents that she would rather be dead
than go to a juvenile facility and, if they ever attempted to
call the police to take her to a juvenile facility, she would
accuse her parents of physically or sexually abusing her. *Id* at
108-09; Respondent's Exhibit 105, pp. 115-16, 120-21.

The defense theorized that J, having learned from a friend
that the police were looking for her, might have mistakenly
believed her parents had asked the authorities to place her in a
juvenile detention facility. This mistaken belief, in turn,
prompted J to follow through on her recent threats to raise
false allegations of abuse involving her parents. Conflicting
evidence emerged at trial as to whether J disclosed Petitioner's
abuse to her friends at the park before or after she discovered
that the police were looking for her. Respondent's Exhibit 104,

---

[3] J would have a second evaluation on May 19, 2011 in response to her
allegations to Officer Johnson regarding Petitioner.

pp. 72, 78. Evidence also showed that J made her allegation of sexual abuse against Petitioner after she learned that Officer Johnson intended to take her to the police station. Respondent's Exhibit 105, pp. 126-28.

The biggest hurdle Petitioner had to overcome was his detailed confession to Louka. Petitioner told Louka that: (1) he had first begun to sexually abuse J when she was ten years old, 15 months before his police interview; (2) "he has never been able to climax while having sex" with J and he would "always finish[] by going into the bathroom and masturbating;" (3) J never complained about pain during sex; (4) he believed J's cutting behavior was attributable to his having sex with her; and (5) he had encouraged J to disclose the abuse because he had difficulty controlling himself. Respondent's Exhibit 123, pp. 5-6.

Petitioner took the stand in his own defense and testified that he only confessed because J had recently threatened to kill herself if authorities placed her in a juvenile detention facility. Respondent's Exhibit 107, pp. 125-27. He reasoned that he would confess to ensure J's safety and retract that confession once he knew she was safe. *Id*. The jury did not find his explanation convincing and convicted him of six counts of Rape in the First Degree, two counts of Rape in the Second Degree, and four counts of Sexual Abuse in the First Degree.[4]

---

[4] Two of Petitioner's convictions for Rape in the First Degree (Counts 10 and 11) came by a vote of 11-1, and the jury acquitted him of two counts of Sodomy in the First Degree (Counts 13 and 14) and one count of Sexual Abuse in the First Degree (Count 15). Respondent's Exhibit 127. The State agreed

Respondent's Exhibit 127. The trial court imposed all sentences concurrently, resulting in a total prison sentence of 300 months. Respondent's Exhibit 101.

Petitioner directly appealed his convictions where, relevant to this habeas corpus case, he challenged the trial court's ruling on his motion to suppress. Respondent's Exhibit 110. The Oregon Court of Appeals affirmed the trial court's decision without issuing a written opinion, and the Oregon Supreme Court denied review. *State v. Santos-Ek*, 261 Or. App. 585, 326 P.3d 78, *rev. denied,* 355 Or. 568, 329 P.3d 771 (2014).

Petitioner next filed for post-conviction relief ("PCR") in Malheur County where the PCR court denied relief on his claims. The Oregon Court of Appeals affirmed the PCR court's decision without opinion, and the Oregon Supreme Court denied review. *Santos-Ek v. Nooth,* 289 Or. App. 822, 412 P.3d 1231, *rev. denied*, 362 Or. 860, 418 P.3d 759 (2018).

On August 24, 2018, Petitioner filed this 28 U.S.C. § 2254 habeas corpus case. With the assistance of appointed counsel, Petitioner filed his Amended Petition wherein he raises four grounds for relief:

> 1.  Trial counsel was ineffective when he failed to object and moved to strike the testimony of Detective Cheryl Banks on the basis that it improperly bolstered J's testimony;
>
> 2.  Trial counsel was ineffective when he failed to present a cohesive defense,

---

to dismiss three other charges at the conclusion of its case. Respondent's Exhibit 105, pp. 217-18.

relying on an alibi defense as to the May 16th incident that he could not substantiate;

3. The trial court violated the Fourth Amendment as well as Petitioner's right to due process when it denied his motion to suppress his statements to the police; and

4. The trial court denied Petitioner's right to due process as well as his trial rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments when it instructed the jury that it had authority to render and then accepted the jury's non-unanimous verdicts of guilty as to two of his convictions (Counts 10 & 11).

First Amended Petition (#40).

Respondent asks the Court to deny relief on the Amended Petition because: (1) Petitioner has not sustained his burden of proof as to Grounds One and Four; (2) Petitioner failed to fairly present Grounds One and Three to Oregon's state courts, leaving them procedurally defaulted and ineligible for habeas corpus review; and (3) to the extent that Petitioner fairly presented Grounds Two and Three, the state-court decisions denying relief on them were not unreasonable.

## DISCUSSION

### I. Unargued Claims

Petitioner provides argument in support of Grounds Two and Three from his Amended Petition, but he does not provide argument on Grounds One and Four. In this respect, he has not carried his burden of proof with respect to these unargued claims. *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (Petitioner bears the burden of proving his claims). Even if

Petitioner had briefed the merits of Grounds One and Four, the record reveals that Petitioner would not be entitled to relief on the unargued claims.

## II. Exhaustion and Procedural Default

As Ground Three, Petitioner alleges that the trial court erred when it refused to suppress his confession to the police. Respondent agrees that Petitioner properly raised the federal basis of Ground Three to the Oregon Court of Appeals during direct review, but claims he abandoned the federal issue when he petitioned the Oregon Supreme Court for review. Because the time for raising the claim with the Oregon Supreme Court passed long ago, Respondent maintains Petitioner's Ground III claim of trial court error is procedurally defaulted and ineligible for habeas corpus review.

A habeas petitioner must exhaust his claims by fairly presenting them to the state's highest court, either through a direct appeal or collateral proceedings, before a federal court will consider the merits of those claims. *Rose v. Lundy*, 455 U.S. 509, 519 (1982). "As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the appropriate state courts . . . in the manner required by the state courts, thereby 'affording the state courts a meaningful opportunity to consider allegations of legal error.'" *Casey v. Moore,* 386 F.3d 896, 915-916 (9th Cir. 2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, (1986)).

If a habeas litigant failed to present his claims to the state courts in a procedural context in which the merits of the

claims were actually considered, the claims have not been fairly
presented to the state courts and are therefore not eligible for
federal habeas corpus review. *Edwards v. Carpenter*, 529 U.S.
446, 453 (2000); *Castille v. Peoples*, 489 U.S. 346, 351 (1989).
In this respect, a petitioner is deemed to have "procedurally
defaulted" his claim if he failed to comply with a state
procedural rule, or failed to raise the claim at the state level
at all. *Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v.
Thompson*, 501 U.S. 722, 750 (1991). If a petitioner has
procedurally defaulted a claim in state court, a federal court
will not review the claim unless the petitioner shows "cause and
prejudice" for the failure to present the constitutional issue
to the state court, or makes a colorable showing of actual
innocence. *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Sawyer
v. Whitley*, 505 U.S. 333, 337 (1992); *Murray v. Carrier*, 477
U.S. 478, 485 (1986).

In his Petition for Review to the Oregon Supreme Court,
Petitioner framed his issue for further appellate review as
follows: "Is a confession unconstitutionally induced when police
promise a defendant that he will not be arrested no matter what,
and then break that promise after the defendant confesses?"
Respondent's Exhibit 112, p. 8. In lieu of providing argument in
his Petition for Review, he properly incorporated the arguments
from the Appellant's Brief he filed with the Oregon Court of
Appeals into his Petition for Review. *Id* at 10; *see also* (ORAP
9.05(3)(a)(v) permitting appellant to rely on briefing filed in
the Oregon Court of Appeals). He also stated, "The first legal

issue is an issue of state law. ORAP 9.07(4)."[5] *Id* at 9; *see also* ORAP 9.07(4) (one criterion for Oregon Supreme Court review is whether a petition presents an issue of state law).

Respondent asserts that Petitioner, enjoying the appointment of counsel during his direct appeal, intentionally limited his claim of trial court error only to one of state law by specifically stating that the "legal is an issue of state law." However, Petitioner's claim in his Petition for Review relied upon the totality of his arguments from his Appellant's Brief wherein he specifically argued that state statutory law as well as that of the Oregon and U.S. Constitutions required that his confession be established as voluntary before it could be used against him. Respondent's Exhibit 132, pp. 16-21. In doing so, he cited the Fourteenth Amendment to the U.S. Constitution as well as several decisions from the U.S. Supreme Court. *Id.* While he alerted the Oregon Supreme Court that he was raising an issue of state law, he never asked the Oregon Supreme Court to only consider the state-law issue nor did he limit his arguments from his Appellant's Brief only to state-law issues. On this record, Petitioner fairly presented the federal basis of his Ground Three claim to the Oregon Supreme Court in a context in which the merits could be considered. As such, Ground Three is eligible for merits review.

///

///

---

[5] The "first legal issue" in the Petition for Review corresponds to the issue raised as Ground Three in this habeas corpus case.

III. **The Merits**

A.    **Standard of Review**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. Twenty-eight U.S.C. § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with

[the Supreme] Court's precedents. It goes no farther."
*Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Twenty-eight U.S.C. § 2254(d)(2) allows a petitioner to
"challenge the substance of the state court's findings and
attempt to show that those findings were not supported by
substantial evidence in the state court record." *Hibbler v.
Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). A state court
renders an unreasonable determination of the facts if it
"plainly misapprehends or misstates the record in making its
findings or where the state court has before it, yet apparently
ignores, evidence that supports petitioner's claim." *Andrew v.
Davis,* 944 F.3d 1092, 1107 (9th Cir. 2019) (internal quotations
omitted). A federal habeas court cannot overturn a state court
decision on factual grounds "unless objectively unreasonable in
light of the evidence presented in the state-court proceeding."
*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This is a
"'daunting standard—one that will be satisfied in relatively few
cases,' especially because we must be 'particularly deferential
to our state-court colleagues.'" *Hernandez v. Holland*, 750 F.3d
843, 857 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992,
1000 (9th Cir. 2004)).

B.    **Analysis**

1.    Ground Two: Ineffective Assistance of Counsel

As part of her May 19, 2011 CARES evaluation stemming from
her allegations against Petitioner, J asserted that Petitioner
sexually assaulted her in the late afternoon of May 16. During
defense counsel's opening statement, he advised the jury that

the evidence would show Petitioner had no opportunity to sexually abuse J on May 16 as she alleged. Counsel provided that Petitioner worked every weekday from 4:00 p.m. until 6:00 a.m. such that "on May 16th from about 3:00 to 3:30 in the afternoon when he left his house all the way until 6:00 in the morning, he was gone. Wasn't there. Couldn't have happened." Respondent's Exhibit 104, p. 58. He reasoned that beyond the May 16 incident, Petitioner was often at work or otherwise engaged with church and family on weekends, and "simply wasn't around to do . . . what [J] described as twice weekly abuse that she describes." *Id.*

Counsel later addressed this issue with investigating detective Cheryl Banks on cross-examination. When asked whether she ever "pull[ed] or look[ed] for Mr. Santos-Ek's work records on May 16th," Banks replied that she had not. Respondent's Exhibit 105, p. 198. During the defense's case, counsel called Rita Munson, a human resources agent with Petitioner's employer. Munson produced records showing Petitioner clocked in for his shift at 5:12 p.m. on May 16, revealing that contrary to defense counsel's representation during opening statements, Petitioner had the opportunity to assault J on that day. Respondent's Exhibit 107, p. 46. The prosecutor addressed this inconsistency during his rebuttal argument. *Id* at 202.

As Ground Two, Petitioner alleges that his trial attorney was constitutionally ineffective when he failed to present a cohesive defense. Petitioner believes that in a case involving a credibility determination, and where the jury acquitted him of

three charges and convicted him by a count of 11-1 on two others, counsel's error resulted in prejudice.

The Court uses the general two-part test established by the Supreme Court to determine whether Petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, Petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether Petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland,* 466 U.S. at 693). When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 122.

The PCR court determined that trial counsel's performance fell below an objective standard of reasonableness, but that Petitioner failed to establish prejudice:

> Petitioner did show that his trial attorney erred by making an opening statement regarding Petitioner's work record and then calling a witness who produced the time record without first looking at the time record. While the attorney may have properly relied on his client's representation of when he was at work, a reasonable attorney would have reviewed the information on the time sheets before making the opening statement and calling the employer.
>
> Petitioner's claim fails, however, because he failed to prove prejudice. The date of May 16 related to only one of the several incidents of sexual abuse alleged. Petitioner had made a lengthy and detailed confession regarding the abuse. At trial, he denied the abuse and claimed the confession was false and that it was motivated by his desire to protect JS. Petitioner testified that he was almost never alone with JS. Petitioner's denial and explanation for the confession, was not credible. There was no evidence to support the argument that, but for counsel's error regarding the work record, there is a tendency that the jury would have believed his testimony. Had his attorney reviewed the work record, not made reference to it in opening and not offered it as evidence, Petitioner would have still been left without an alibi for the allegation of abuse on May 16. The Petitioner has not proven that the error had a tendency to affect the outcome of the trial.

Respondent's Exhibit 158, p. 4.

Petitioner first asserts that the PCR court's decision was unreasonable because it did not apply the *Strickland* standard

for prejudice and, instead, applied the state standard as to whether counsel's error had a "tendency" to affect the outcome of the case. *See Green v. Franke,* 357 Or. 301, 323, 350 P.3d 188 (2015). Petitioner made no such claim in his PCR appeal, and specifically stated in his Appellant's Brief to the Oregon Court of Appeals that the state and federal standards for ineffective assistance of counsel claims are equivalent such that he declined argue them separately. Respondent's Exhibit 159, p. 15 n. 4. Petitioner may not now contend that the PCR court improperly focused its analysis on state law to the exclusion of the federal issue.

Petitioner also argues that the PCR court's decision was unreasonable insofar as it failed to recognize the gravity of counsel's error. He maintains that in a case that amounted to a credibility contest, counsel not only failed to deliver the evidence he promised during his opening statement, but introduced evidence that affirmatively established that Petitioner had enough time before work to sexually assault J on May 16. He contends that such a glaring error suggested to the jury that, contrary to other evidence the defense presented that Petitioner's work schedule seldom put him at home at the same time as J, his schedule might have actually allowed him to be far more present than the defense indicated.

Petitioner's work schedule, even beyond the May 16 incident, was not the central focus of the defense. Instead, counsel introduced evidence that J and her parents had a volatile relationship, that J had threatened to falsely accuse

Petitioner of sexual abuse as recently as one week before she actually did so, and that J had not disclosed any parental abuse when discussing her abuse by Mazell during her February 11, 2011 CARES evaluation. In this respect, and where the allegations of routine abuse covered an extended period of time, counsel's error regarding the timeline on May 16 did not undermine his defense as a whole.

Even if counsel's error were highly significant, Petitioner still would be unable to establish prejudice. He had not only confessed in detail to sexually abusing J, but confessed to having abused her over the course of 15 months, not just on a single day. While he sought to explain his confession in terms of protecting J, the PCR court specifically concluded that Petitioner was not credible in doing so. Because Petitioner provides no clear and convincing evidence to rebut this credibility determination, this Court accepts it as true. *See* 28 U.S.C. § 2254(e)(1). Where Petitioner was unable to offer any credible explanation underlying his detailed confession, there is no reasonable likelihood that counsel's error affected the outcome of his case. Accordingly, the PCR court's decision denying relief on Ground Two was not unreasonable.

### 2.   Ground Three: Voluntariness of Confession

As Ground Three, Petitioner alleges that Louka unlawfully coerced his confession. He maintains that he went to the police station fearing for his daughter's safety, but Louka did not provide him with any information to assuage his fears. Instead, Petitioner contends, Louka accused him of sexually abusing J,

lied to him about the existence of evidence pertaining to the abuse, and promised to release him if Petitioner would be honest, *i.e.*, confess to abusing J. He claims that his limited educational background as well as his Mexican culture exacerbated the impact of these circumstances.

If a criminal defendant confesses to a crime because his interrogators have overborne his will, then the confession "cannot be deemed the product of a rational intellect and a free will." *Lynum v. Illinois*, 372 U.S. 528, 534 (1963). "Whether a confession is voluntary is determined under the totality of the circumstances, which include 'the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health.'" *Taylor v. Maddox* 366 F.3d 992, 1015 (9th Cir. 2004) (citing *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (citations omitted)).

The trial court considered the issue of Petitioner's confession at some length. It determined that Louka had made neither a threat nor a promise to induce the confession, and that Louka's pledge not to arrest Petitioner was not what "drove the conversation, drove the confession forward." Respondent's Exhibit 103, pp. 139-40. The trial judge highlighted that Petitioner's immediate response to Louka's pledge not to arrest him that day was, "I don't want to keep lying." *Id* at 139. The judge was therefore of the opinion that "the defendant confessed or made admissions because he wanted to be honest. He wanted to unburden his soul." *Id* at 140.

With respect to the totality of the circumstances as they related to the voluntariness of Petitioner's confession, the trial court ruled as follows:

> Turning now to the issue of voluntariness. Under the totality of the circumstances, the court finds that the statements made to Officer Louka were knowingly made. The statements came after defendant was orally advised of his Miranda rights and waived them. The court finds that they were voluntarily made.
>
> In addition to the court finding specifically that threats and promises were not made, the court finds that the defendant wasn't in any other way coerced, nor do the circumstances suggest his will was overborne or his capacity to make a determination about whether or not to speak to the officer was overcome.
>
> Of particular note to the court was that defendant voluntarily came to the police department. Initially, before any meaningful conversation was held about the facts of the case, defendant was advised of and subsequently waived his Miranda rights. That although the location of the interview was at the police station, there is nothing about the circumstances of the location that would suggest to the court that – that the defendant was coerced or his will was overborne.
>
> There wasn't a request that the defendant stop the interview. There wasn't a request for a break. When defendant requested food, he was provided food. Defendant did not request an attorney, did not request the right to remain silent. Throughout the course of the almost two-hour interview, it is clear that the defendant in tone, demeanor, presentation and affect was cooperative. He was coherent.

> There's no indication or evidence that the
> defendant was suffering from a mental or
> physical impairment or that drugs or alcohol
> was an influencing factor in any way in the
> conversation. There was an interpreter
> provided and from the context of the
> interview with the police officers, it
> appears to the court that the defendant was
> able to communicate coherently with both
> Officer Rios and Officer Louka.
>
> So, for all those reasons, the court finds
> that the statements made to Officer[s] Louka
> and Rios on May 18th, 2011, are admissible.

Respondent's Exhibit 103, pp. 140-42.

Although Petitioner claims that the trial court failed to apply the Fourteenth Amendment's totality of the circumstances test, it clearly did so as reflected above. Petitioner also contends that the coercive pressure, combined with Louka's pledge not to arrest him if he stopped denying the abuse, created an atmosphere that rendered his confession inadmissible.

Respondent argues that the voluntariness question is not close because Petitioner was not even in custody at the time he spoke with police. It is true that Petitioner traveled to the police station voluntarily and that the authorities did not take him into custody until the conclusion of questioning. However, after requiring that Petitioner wait hours before speaking with them, the authorities proceeded to administer the *Miranda* warnings twice (once in English, once in Spanish), questioned him at the police station while recording the session, accused him of committing serious crimes against his daughter, advised him (falsely) that hospital staff had discovered incriminating

evidence, and never advised him that he was free to leave. These factors, individually, may not lead to the conclusion that this was a custodial interrogation. *See, e.g., California v. Beheler,* 463 U.S. 1121, 1125 (1983) (questioning is not custodial simply because it takes place at a police station). Taken together, however, this broad combination of events bears many of the hallmarks of a custodial interrogation.

If the authorities did not subject Petitioner to a custodial interrogation, no *Miranda* warnings were required. *Illinois v. Perkins,* 496 U.S. 292, 296-97 (1990). Even if Petitioner's interrogation was custodial in nature, the police advised him of his rights under *Miranda* and he willingly waived those rights. This was a significant event in the context of a voluntariness assessment. *See, e.g., Missouri v. Seibert,* 542 U.S. 600, 609 (2004) (waiver of *Miranda* rights results in "a virtual ticket of admissibility"). Moreover, as the trial court noted, the interview was not excessively long, Petitioner never asked to leave or take a break, authorities provided him food when he asked, and Petitioner was generally cooperative and coherent.

Louka's misrepresentation about the discovery of evidence at the hospital does not render the resulting confession inadmissible. *See Frazier v. Cupp,* 394 U.S. 731, 739 (1969). While Petitioner frames Louka's pledge not to arrest him that night if he told the truth as a *quid pro quo,* the trial court carefully examined the context of that pledge and the ensuing conversation and reasonably concluded that: (1) Petitioner did

not rely on Louka's statement; and (2) it did not lead to the confession. Respondent's Exhibit 103, pp. 139-40. This was not an unreasonable determination, especially when one considers that Louka's pledge to refrain from arresting Petitioner was limited to that day only. Stated differently, at no time did Louka pledge to never arrest Petitioner if he confessed or that he would otherwise escape culpability by taking responsibility for the crimes. Petitioner's educational level and cultural heritage do not alter this analysis.

The trial court carefully considered this claim and rendered a thorough decision that the totality of the circumstances showed Petitioner's confession to be voluntary. At a minimum, that decision was not so unreasonable that no fairminded jurist could agree with it. *See Harrington,* 562 U.S. at 102. Habeas corpus relief is therefore not appropriate.

## CONCLUSION

For the reasons identified above, the Amended Petition for Writ of Habeas Corpus (#40) is denied. The Court does, however, allow a Certificate of Appealability as to whether Petitioner is entitled to habeas corpus relief on Grounds Two and Three of the Amended Petition.

IT IS SO ORDERED.

| | |
|---|---|
| July 1, 2022 | *Marco Hernandez* |
| DATE | Marco A. Hernandez |
| | United States District Judge |